IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Otis James Compton, | ) | Civil Action No.:2:15-cv-03310-BHH-MGB |
| | ) | |
| Petitioner, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| v. | ) | **OF MAGISTRATE JUDGE** |
| | ) | |
| Warden Leroy Cartledge, | ) | |
| | ) | |
| Respondent. | ) | |

The Petitioner, a state prisoner, seeks habeas relief pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Respondent's Motion for Summary Judgment. (Dkt. No. 11; *see also* Dkt. No. 12.)

Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Local Rule 73.02(B)(2)(c), D.S.C., this magistrate judge is authorized to review the instant petition for relief and submit findings and recommendations to the District Court.

The Petitioner, through counsel, brought the instant habeas action on August 19, 2015. (*See* Dkt. No. 1; Dkt. No. 1-1.) On December 7, 2015, Respondent filed a Motion for Summary Judgment. (Dkt. No. 11; *see also* Dkt. No. 12.) Petitioner filed a Response in Opposition to the Motion for Summary Judgment on March 30, 2016. (Dkt. No. 22.) For the reasons set forth herein, the undersigned recommends granting Respondent's Motion for Summary Judgment (Dkt. No. 11.)

**PROCEDURAL HISTORY**

The Petitioner is currently confined within the South Carolina Department of Corrections ("SCDC"). In October of 2000, the Abbeville County Grand Jury indicted Petitioner for burglary, murder, armed robbery, malicious injury to real property, and possession of a firearm or knife during the commission of a violent crime. (*See* R. at 1836-38.) Petitioner was represented by E. Charles Grose, Jr., Esquire. (*See* Dkt. No. 12-5 at 4 of 384.) Petitioner proceeded to a jury trial before the

Honorable Wyatt T. Saunders on November 18-23 of 2002. (*See* R. at 1-1174.)[1] On November 23, 2002, the jury convicted Petitioner as charged. (R. at 1162-64.) Judge Saunders sentenced Petitioner to life on the convictions for burglary, murder, and armed robbery; thirty days, concurrent, on the conviction for malicious injury to real property; and five years, consecutive, on the conviction for possession of a firearm or knife during the commission of a violent crime. (R. at 1173.)

Petitioner appealed and was represented by Robert M. Dudek, Esquire, and E. Charles Grose, Jr., Esquire. (*See* R. at 1513.) On May 27, 2005, Petitioner filed a Final Brief of Appellant, wherein he raised the following issues:

1. Whether the court erred by refusing to quash the indictment while ruling that the plea agreement dated July 12, 2000, which was signed by appellant, his attorney, the solicitor and the Sheriff of Abbeville, was not an immunity agreement as to any information appellant would provide the authorities about the Hanna homicide in return for a reduced sentence on his burglary convictions, since this was the plain meaning of the plea agreement?

2. Whether the court erred by ruling that statements appellant gave to the police during the period covered by the plea agreement could be used against him during his murder trial, since Rule 410, SCRE, provides that statements made with the intention that a plea of guilty will follow are not admissible when that guilty plea is never finalized?

3. Whether the court erred by ruling appellant's statements were admissible against him during his murder trial where they were the product of promises made in the plea agreement, and statements induced by promises of leniency are not admissible?

4. Whether the court erred by refusing to suppress appellant's statements since they were obtained in violation of his Sixth Amendment right to counsel where government informant Tracey Black, a government agent, initiated contact with appellant on behalf of law enforcement while appellant was being represented by an attorney in an ongoing effort to have his burglary sentence reduced, and these contacts were initiated without counsel's knowledge or consent?

5. Whether the court erred by ruling defense counsel could not examine Solicitor Jones regarding his prior testimony at a pre-trial hearing where Solicitor Jones admitted that he contemplated appellant's attorney, Joe Smithdeal, being involved in the future of this case, as the solicitor's testimony at the prior hearing was admissible

---

[1]Although the trial transcript itself indicates the trial was in November of 2001, the index states that the trial was held in 2002. (*See* Dkt. No. 12-5 at 2, 4 of 384.)

as a prior inconsistent statement, and the trial court's limitation on this permissible examination also violated appellant's right to confrontation?

(R. at 1513-72.)

In a published opinion filed on December 19, 2005, the South Carolina Court of Appeals affirmed the decision of the lower court. *See State v. Compton*, 366 S.C. 371, 623 S.E.2d 661 (Ct. App. 2005). Petitioner filed a Petition for Rehearing, which was denied on March 29, 2006. (R. at 1615-29.) On June 29, 2006, Petitioner filed a Petition for Writ of Certiorari. (R. at 1630-80.) In an order dated August 9, 2007, the South Carolina Supreme Court denied the Petition for Writ of Certiorari. (R. at 1711.) The remittitur was issued on August 15, 2007. (R. at 1713.) On November 7, 2007, Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court. (R. at 1714-46.) The United States Supreme Court denied the Petition for a Writ of Certiorari on January 7, 2008. (R. at 1759.)

On March 27, 2008, Petitioner filed an application for post-conviction relief ("PCR"). (R. at 1760-66.) The following questions and answers appeared in his PCR application:

9. State concisely the grounds on which you base your allegation that you are being held in custody unlawfully:

(a) Ineffective assistance of counsel

(b) Violation of Precedent case law[,] statutory law[,] and state constitution

(c) Violation of U.S. Constitutional rights 4th 5th 6th 8th 14th amendments.

10. State concisely and in the same order the facts which support each of the grounds set out in (9):

(a) Attorney Grose was ineffective prior to and during trial and fell below the requirements set forth in Strickland.

(b) Attorney Grose did not vehemently challenge the grand-jury procedure attack the use of a paid informant truth & veracity of same

(c) Attorney Grose did not challenge right to remain silent right to a fair trial prosecutorial misconduct law-enforcement misconduct alibi defense

3

(R. at 1761-62.)

On August 18 and October 29 of 2009, an evidentiary hearing was held before the Honorable D. Garrison Hill. (R. at 1859-1923, 1927-2030.) Petitioner was present and represented by Tara Shurling, Esquire. (*See* R. at 1859, 1927.) In an order dated February 25, 2010, Judge Hill denied the application for post-conviction relief and dismissed the petition. (R. at 2034-58.)

On March 7, 2011, Petitioner, through his attorney Tara Dawn Shurling, filed a Petition for Writ of Certiorari. (*See* Dkt. No. 12-2.) Therein, Petitioner raised the following issues:

> I. Did the lower court err in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of counsel prior to trial, as secured by the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, Section 13 of the South Carolina Constitution, had been violated when Attorney Smithdeal failed to obtain a definitive immunity agreement with the State before permitting the Petitioner to provide a statement to the police concerning the murder of the victim?

> II. Did the lower court err in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of counsel prior to trial, as secured by the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, Section 13 of the South Carolina Constitution, had been violated when Attorney Smithdeal failed to assert the Petitioner's Fifth Amendment right to remain silent and failed to establish his position as counsel for the Petitioner in connection with anything relating to this homicide and any charges which might be brought relating to it?

> III. Did the lower court err in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of trial counsel, as secured by the Sixth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, Section 13 of the South Carolina Constitution, had been violated when trial counsel was ineffective for failing to object to the State's use of the Petitioner's prior burglary convictions?

> IV. Did the lower court err in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of appellate counsel, as secured by the Sixth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, Section 13 of the South Carolina Constitution, had been violated when appellate counsel was ineffective for failing to raise on direct appeal the ground that the Petitioner's Fifth Amendment rights had been violated?

(Dkt. No. 12-2 at 3 of 25.)

4

The South Carolina Supreme Court entered an order denying the petition for a writ of certiorari on November 7, 2014. (Dkt. No. 12-3.) The matter was remitted to the lower court on November 25, 2014. (Dkt. No. 12-4.)

Petitioner then filed the instant habeas petition, wherein he raised the following grounds for review:

**Ground One**: The South Carolina Court of Appeals erred, and thereby violated Petitioner's rights under the Fifth and Fourteenth Amendments to the United States Constitution, by holding Petitioner's statements made to the police in furtherance of an unkept written agreement were admissible against him during his subsequent murder trial, where the statements in question were induced by promises of leniency in exchange for information about the murder.

**Ground Two**: The South Carolina Court of Appeals erred by holding Petitioner's statements to informant Tracey Black were not obtained in violation of Petitioner's Sixth Amendment right to counsel where Black initiated contact with Petitioner while he was a government agent, and while Petitioner was represented by counsel on the plea agreement with the state.

**Ground Three**: The South Carolina Court of Appeals erred by ruling the trial court did not impermissibly limit his cross-examination of Solicitor Jones regarding his prior testimony at a pre-trial hearing where Solicitor Jones admitted in that testimony that he contemplated Petitioner's attorney being involved in the future to fulfill the terms of the plea agreement and therefore, the solicitor's testimony at the prior hearing was admissible as a prior inconsistent statement, and the trial court's limitation on this permissible cross-examination violated Petitioner's Constitutional right to confrontation as protected by the Sixth and Fourteenth Amendments to the United States Constitution.

**Ground Four**: The South Carolina Court of Common Pleas erred in denying the Petitioner Post-Conviction relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of counsel prior to trial, as secured by the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, as well as Article I, Section 13 of the South Carolina Constitution, was violated when Attorney Smithdeal failed to obtain a definitive immunity agreement with the State before permitting the Petitioner to provide a statement to police concerning the murder of the victim.

**Ground Five**: The South Carolina Court of Common Pleas erred in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of counsel prior to trial, as secured by the Fifth, Sixth and Fourteenth Amendments of the U.S. Constitution, had been violated when Attorney Smithdeal failed to assert the Petitioner's Fifth Amendment right to remain silent and failed to establish his position as counsel for

5

the Petitioner in connection with anything relating to this homicide and any charges which might be brought relating to it[.]

**Ground Six**: The South Carolina Court of Common Pleas erred in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of trial counsel, as secured by the Sixth and Fourteenth Amendments of the U.S. Constitution, was violated when trial counsel failed to object to the State's use of the Petitioner's prior burglary convictions.

**Ground Seven**: The South Carolina Court of Common Pleas erred in denying the Petitioner Post-Conviction Relief where he met his burden of proof regarding his allegation that his constitutional right to effective assistance of appellate counsel, as secured by the Sixth and Fourteenth Amendments of the U.S. Constitution, was violated when appellate counsel failed to raise on direct appeal the ground that the Petitioner's Fifth Amendment rights had been violated.

(Dkt. No. 1-1 at 4-48 of 51.)

## APPLICABLE LAW

### Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123-24 (4th Cir. 1990).

### Habeas Standard of Review

Since the Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. §

6

2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir.1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> 1. resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> 2. resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 398 (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 410. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## DISCUSSION

As noted above, Respondent seeks summary judgment in the instant case. (Dkt. No. 11; *see also* Dkt. No. 12.) Before turning to Petitioner's grounds for relief, the undersigned will briefly review the facts of the case.

On August 6, 1999, an individual named Johnny Hanna was murdered in his home. Jeffrey Hanna, son of the decedent, testified that on August 6, 1999, he returned home to find the glass in the gun cabinet (which was usually locked) broken, and the "little drawer [under the television] for tapes to be put up" was "pulled out and [everything] thrown around." (R. at 97-98, 110-13.) When he got to his parents' bedroom, he saw his father, the decedent, lying on his back; a knife was laying on the decedent's chest. (R. at 114-15.) Jeffrey testified that the closet doors in his parents' bedroom were "open and everything had been thrown out on–all kind of clothes scattered everywhere." (R.

at 117.) He testified that he called 911. (R. at 116.) When asked if anything was taken from his home, Jeffrey stated, "Binoculars and some money, and I think some jewelry and stuff." (R. at 125.)

Chief Johnson of the Abbeville County Sheriff's Office testified that as a result of his initial investigation, Petitioner was one of the individuals he was "attempting to locate that [he] wanted to talk with." (R. at 284.) Sheriff Goodwin testified that Petitioner was identified as a suspect early in the investigation because he had been arrested on several burglaries in the area. (R. at 633-34.) According to Goodwin, Petitioner had been released on bond on the burglaries approximately six or seven days before Johnny Hanna was murdered. (R. at 635.) Chief Johnson further testified that on August 13, 1999, after being read his *Miranda* rights, Petitioner spoke with Johnson. (R. at 298-302.) Johnson stated, "I made the comment to [Petitioner] that hopefully we'd be getting results back from blood and hair and so forth from the scene [of the murder], and would any of that evidence that we have, would it happen to be his and he made the comment 'How could it be mine if I stayed in the car?' Something to that effect." (R. at 302.)

Johnson also testified that in March of 2000, the Sheriff contacted him and told him "we needed to ride to McCormick [Correctional Institution] and talk with someone there." (R. at 303-04.) According to Johnson, he–along with Sheriff Goodwin, Detective Alford, and Lieutenant Templeton–met with Tracey Black, an inmate at McCormick Correctional Institution ("MCI") on March 9, 2000. (R. at 304, 312.) Johnson indicated that while Petitioner and Tracey Black were in a holding cell at the Anderson County Courthouse, Petitioner told Black that "he was doing fifteen years for a burglary conviction that he got . . . in Abbeville County," and that Petitioner "took the rap for it, that Angel was with him and also another guy was with them, but he took the rap because he thought that Angel would keep quiet about a burglary that had gone bad." (R. at 312-13.) Johnson further indicated that Tracey Black stated that Petitioner told him "the man came home and that he did what he had to do." (R. at 314.) According to Johnson, Tracey Black was later transferred to Kershaw Correctional Institution, where Petitioner was located, and Johnson "specifically remember[s that] Agent Templeton told Mr. Black do not engage in any conversations, do not ask

him any questions, but to keep his eyes and ears open and listen, and that if he heard anything that would help us in this case to give his mother a call who would in turn contact the Sheriff." (R. at 315.)

Chief Johnson also testified that on October 10, 2000, Agent Templeton advised Petitioner of his *Miranda* rights. (R. at 316-17.) Johnson testified that Petitioner told him, Sheriff Goodwin, Agent Templeton, and Agent Gambrell that he was present when Johnny Hanna was killed; "[Petitioner] stated that Robert stabbed Johnny[, t]hat Shane shot him and hit him with a bat, and that he stated he didn't want to go, he did not go inside." (R. at 319-20.)

Tracey Black testified that on January 18, 2000, he was at the Anderson County Courthouse to enter a guilty plea when he saw Petitioner. (R. at 402-04.) Black stated,

> They placed me in the cell and I walked to the door and I seen [sic] Mr. Compton[.] He shook my hand and we kind of hugged necks because I hadn't seen him in eight or ten years and we had talked about–he had talked to me and told me he was down at Kershaw and how much time he had and what he was back there to get run concurrent with all the time he had and I run down to him where I was at and all, and he told me they had him as a suspect in a murder, and I listened to him talk and he said that–I asked him had he had any involvement in the murder at the time and he said he had done what he had to do[.] He had told me what murder, what the name of the person was and all, which I didn't barely know Johnny Hanna[.] I know his family[.] He explained it to me and I left it at that.

(R. at 405.) According to Black, Petitioner told him that he was serving fifteen years on burglary charges; Petitioner told Black that he "had covered for Angel [Compton], for her to keep her mouth shut about another burglary," a burglary "that had went bad." (R. at 406-07.) When asked if Petitioner told Black how the burglary "went bad," Black testified "[t]hat the house was being broke [sic] into and Johnny Hanna had come home and they had to do what they had to do." (R. at 407.) Black subsequently told Agent Tafoa that he had information about the Hanna homicide. (R. at 409-11.)

Tracey Black testified that he told officers that if they moved him to Kershaw that he "could listen for them and see if there was anything else said." (R. at 414.) When asked what instructions he was given, Black stated,

> To listen to [Petitioner] and see if he would talk about the case any more or what he had done or any involvement in it[.] They told me that I could not question the guy or pursue nothing toward him, just listen.

(R. at 414.) According to Black, he followed the officers' instructions "[v]ery well." (R. at 415.)

Black testified that he saw Petitioner in the cafeteria (verbatim):

> Me and a couple of my buddies was sitting at the table and Otis he came out there and talked to me like he usually did, and he came out there and we was all cutting up and he made a motion about how he shot with a gun, with his hand like that right there and I made a comment to him, I said, Boy, you're crazy, like that and he made a comment in front of me and two other guys that he had to do what he had to do.

(R. at 419.) Black further testified as follows:

> Q. And what if anything was he saying when he was making this gesture like he was shooting the gun?
>
> A. How he shot Mr. Hanna
>
> Q. And did he make any sounds as he was making the motions?
>
> A. He was talking and making sounds, just like pow, pow, pow
>
> Q. Like a shot sound?
>
> A. Yes, sir
>
> Q. And how many shot sounds, pow, pow, pow did you recall him making, Tracey?
>
> A. Several
>
> Q. Several?
>
> A. Three or four

(R. at 420.)

Black also testified that he subsequently became Petitioner's roommate at Kershaw. (R. at 422-23.) Black testified that prior to October of 2000, Petitioner told Black that he was the driver of the car and that Robert Compton and Shane Rice were also involved in the homicide. (R. at 425-26.)

Black indicated that Petitioner told him the following things were removed from the house: a jewelry box, a watch, and some women's cosmetics. (R. at 426.)

Sheriff Goodwin testified that Petitioner was brought to the Abbeville County Courthouse on July 12 or July 13 of 2000 for "the trial of his wife, Angel Burdette Compton." (R. at 639-40.) Goodwin stated that when he went to the jail on July 12, 2000, one of the jailers told him that Petitioner wanted to speak with him. (R. at 640.) According to Sheriff Goodwin, Petitioner "said he thought he had some information in regard to the Hanna case that would be very helpful to us." (R. at 641.) Goodwin further stated,

> Mr. Compton said that he would give us a statement if we would reduce his sentence on the burglary charges that he had been convicted of, or had pled guilty to in November, if we could reduce it from a violent fifteen years to a nonviolent fifteen years[.]

(R. at 641.) Goodwin stated that Petitioner indicated he had an attorney, the "attorney that had represented him in the burglary charges," so they "loaded him up and took him to the attorney he requested," Mr. Smithdeal. (R. at 641.) Goodwin stated that when they got to Mr. Smithdeal's office, Petitioner and Mr. Smithdeal conferred privately for approximately 45 minutes. (R. at 644-45.) Lieutenant Templeton testified that Petitioner was read his *Miranda* rights and signed a form acknowledging those rights; attorney Smithdeal was one of the witnesses who signed this form as well. (R. at 476-83.) Goodwin testified that thereafter the agreement marked as Defendant's Exhibit Number 2 was prepared and signed. (R. at 645.) The specifics of this agreement, which are relevant to some of Petitioner's grounds for relief, will be discussed in more detail below. (*See also* R. at 1756-57.)

Sheriff Goodwin testified that on October 9, 2000, Petitioner called him and said that "he wanted to get something off his chest that had been bothering him and he wanted to tell [Goodwin] the truth about the Hanna case." (R. at 647-48.) According to Goodwin, Petitioner said "he'd like to be brought back to Abbeville and he'd like for . . . Tracey Black to be brought back to Abbeville with him." (R. at 648.) Petitioner and Tracey Black were transported to the Abbeville County Courthouse

in the early morning hours of October 10, 2000; according to Sheriff Goodwin, Petitioner was read

his *Miranda* rights and waived them. (R. at 649-51.) Goodwin further testified as follows:

> Q. And what if anything did [Petitioner] say at 12:48 am [on October 10, 2000]?
>
> . . .
>
> A. At 12:48 am after being advised of his rights Otis Compton stated to us–and when I say us, Lieutenant Gambrell, I mean Officer Gambrell and Lieutenant Sandy Templeton that he was present when Johnny Hanna was killed, and he went further to tell us that who killed him and that he was sitting in the car, and who hit him over the head, and who stabbed him and all[.]
>
> Q. And that indicates, Sheriff, on there Robert stabbed, correct?
>
> A. That's correct[.] Robert stabbed him[.]
>
> Q. Shane shot him and hit him with the bat?
>
> A. Shane shot him and hit Johnny with the bat[.]
>
> Q. And Otis did what?
>
> A. And Otis stated that he was driving the truck[.]

(R. at 651-52.)

Detective Alford testified that on October 25, 2000, he was present at the Hanna house with

Petitioner and others, including Sheriff Goodwin, Chief Johnson, and Dr. Woodard, the pathologist.

(R. at 704-08.) Alford testified that he advised Petitioner of his *Miranda* rights. (R. at 704-09.)

Alford further testified as follows:

> We then walked around the back of the residence and that is where Dr. Woodard and Steve Derrick joined us[.] Pretty much at that time the Sheriff, the Chief, Steve, and I think Sandy was standing next to us, but most of the people stood back a ways away from where Otis was talking to Dr. Woodard and Steve Derrick[.] I kind of stood behind them and listened so I could reduce it to notes later on what Otis was saying, and basically he told us that he was driving the vehicle[.] He drove around the back of the residence[.] He said that he was standing in the back of the residence, that Robert Compton and Shane Rice had went inside the residence and they were bringing stuff out of the house and stacking it up by the back door and at that time he would then take some of the items from there to the car, or truck he called it at that time, and he said that while he was standing in the back yard he thought he heard a

vehicle arrive[.] He said he looked over the pool deck area of the house and he saw the victim, Johnny Hanna's black pick-up pull up and park underneath a tree[.] At that time he said he didn't really know what was going to happen[.] He hoped those guys got out of there quickly[.] He said about a minute or so later he heard a commotion inside[.] He said a window broke near the left of the back door and also that he saw Robert Compton come running towards the back door and hiding behind the door[.] He said then Johnny Hanna came out through that door and Robert jabbed him underhand in the neck and in the chest area with a knife[.] He said they then got into a big tussle and struggle and fell to the floor, grabbing each other. . . . And then he said at that time while they were on the floor, Shane Rice came and jumped over them and jumped onto the porch and jumped down the stairs into the yard area[.] He said Robert then jumped up off the ground, ran outside, as he was–basically he said he like put his hand on the railway of the porch and vaulted over onto the grass and as he did he threw the knife handle down near the air conditioner next to the porch and took off running towards the field . . . . [A]nd then Shane started shooting[.] He said the first bullet Shane shot hit Mr. Hanna, hit Johnny Hanna in the arm with the watch on it[.] He then said that the second shot Shane shot hit him in the stomach area which knocked him to the ground on the porch, where he said he was basically on the top step of the porch, and as the shot hit him he fell backwards onto the porch area[.] He said then very rapidly after that was two more shots that Shane had shot[.] He had one step, one foot on the bottom step and one foot on the ground, that's where Shane was according to Otis Compton[.] He shot two more times striking Johnny Hanna and then he said Shane went up the steps, straddled Johnny Hanna, stood over him and shot one time straight down into his head[.] He said at that time Shane came back down, got into the truck with him[.] He said they drove away, drove out of the driveway at a, in a hurry, dug out as they call it in the grass, almost hit the telephone pole, and then drove down the driveway and took a right on Hilley Road . . . .

(R. at 710-12.)

In October of 2000, Petitioner was indicted on various charges related to Mr. Hanna's murder: burglary, murder, armed robbery, malicious injury to real property, and possession of a firearm or knife during the commission of a violent crime. (*See* R. at 1836-38.)

For the reasons set forth herein, the undersigned recommends granting the Motion for Summary Judgment. (Dkt. No. 11.)

## A.    **Ground One**

Petitioner asserts in Ground One that his constitutional rights were violated when statements he "made to the police in furtherance of an unkept written agreement" were admitted "against him

during his subsequent murder trial, where the statements in question were induced by promises of leniency in exchange for information about the murder." (Dkt. No. 1-1 at 4 of 51.)

On July 12, 2000, Petitioner entered into an agreement with the State of South Carolina. (*See* R. at 1756-57.) Petitioner signed the agreement, as did W. Townes Jones, IV, Solicitor of the Eighth Judicial Circuit; Charles Goodwin, Sheriff of Abbeville County; and Joe Smithdeal, attorney for Petitioner. (*See* R. at 1757-58.) The document is entitled a "PLEA AGREEMENT." (*See* R. at 1756.) Because of its importance to the grounds raised in the case *sub judice*, the undersigned quotes the entire document herein:

> AGREEMENT MADE THIS 12th day of July 2000 between and among the State of South Carolina, as represented by Solicitor W Townes Jones IV, Defendant Otis James Compton, and his attorney Joe Smithdeal Esquire
>
> IN CONSIDERATION of the mutual promises made herein the parties hereto agree as follows
>
> 1. The defendant Otis James Compton agrees to fully and truthfully cooperate with the Eighth Circuit Solicitor's Office and local and state law enforcement agents in their investigation of the events involving the death of Johnny Hanna. This cooperation is to include, but is not limited to truthful and complete debriefings of the Defendant's knowledge concerning those matters and any related unlawful activities[.] Also, the defendant, Otis James Compton, understands that he must fully disclose and provide truthful information to the State including any books, papers or documents or any other items of evidentiary value to the investigation[.] The defendant[,] Otis James Compton, must also testify fully and truthfully at any trials or other proceedings if called upon to do so by the State[.] The defendant Otis James Compton will also be subject to prosecution for perjury for not testifying truthfully regarding the involvement of the Defendant himself or any other subject that may have been involved with the commission of the Murder of Johnny Hanna[.] The failure of the defendant Otis James Compton to be truthful o[r] to cooperate at any stage can cause the State's obligations under this agreement to become null and void[.]
>
> 2. The defendant Otis James Compton agrees to give a truthful statement in writing or otherwise of his knowledge concerning the death of Johnny Hanna. The defendant Otis James Compton furthe[r] agree[s] to take a polygraph test concerning his knowledge of the death of Johnny Hanna[.]
>
> 3. That if the state can reasonably determine that the statement and all other information has been given truthfully by the defendant Otis James Compton and said information does assist in the investigation of the death of Johnny Hanna and result in an arrest[,] the State agrees to reduce the sentences by all reasonable means on Indictment #'s 99GS01-303 309 to Burglary Second Degree Non Violent, for Seven and One half (7 ½) years, to run concurrent with each other and concurrent with all

other sentences now serving within 18 months of arrest or within 2 years from date of this agreement.

4. That this agreement becomes null and void if the State determines that the defendant Otis James Compton has been untruthful in any representation made to the State concerning the Murder and death of Johnny Hanna[.] The parties hereby agree that this Plea Agreement supersedes all prior promises, representation[s] and statements of the parties[;] that this agreement may be modified only in writing signed by all parties[;] and that any and all other promises, representations and statements whether made prior to or after this Agreement are null and void[.]

5. The conditions and obligations under this agreement are binding upon all parties until this agreement is declared null and void by the Court upon motion of the State[.]

(R. at 1756-57.) As noted above, this document was signed by Petitioner, Attorney Smithdeal, Solicitor Jones, and Sheriff Goodwin. (R. at 1757.)

Prior to trial, Judge Saunders held a hearing on November 14, 2002, in which he heard Petitioner's "Motion to Quash Indictment Based on an Immunity Agreement, or in the Alternative to Suppress Statements." (*See* R. at 1246-1512, 1264.) At the hearing, the following individuals testified: Marion Johnson, Chief Deputy with the Abbeville Sheriff's Office; David Tafoa of SLED; Cletis Templeton of SLED; Steve Gambrell of SLED; Tracy Black; W. Townes Jones, IV, Solicitor of the Eighth Judicial Circuit. (R. at 1268-1481.) After the testimony, defense counsel argued, *inter alia*,

The only type of immunity that we have in South Carolina is transactional immunity, and the undisputed testimony is that the agreement does not contemplate any prosecution for murder and that in fact a prosecution for murder and a thirty-year sentence for murder would frustrate the clear and plain language of the agreement that at the end of all this–he gives information, he testifies in the prosecutions that arise out of Johnny Hanna's death, and at the end of the day there's going to be a seven-and-a-half year sentence for nonviolent burglary and no other sentence or conviction is contemplated[.] So our position first is that the agreement granted immunity[.] Would have to by the terms of the agreement.

(R. at 1485-86.) Defense counsel also argued that Petitioner's statements were not admissible pursuant to Rule 410 of the South Carolina Rules of Evidence. (R. at 1486-91.) He further argued that Petitioner's statements to Tracy Black should not be admitted because they were obtained in violation of Petitioner's rights pursuant to the Fifth and Sixth Amendments. (R. at 1491-94.)

15

The judge denied Petitioner's motion, stating, *inter alia*,

The plea agreement, Defendant's Exhibit No. 2 is essentially a contract[.] A contract is an agreement wherein consideration is given for the benefits derived[.] The court notes that this agreement was not made in the course of any plea discussions with regard to this indictment[.] The contract being styled a plea agreement, Defendant's Exhibit No. 2, concerns benefits which may be obtained by this Defendant arising out of his cooperation which may lead to the arrest for the murder of Johnny Hanna, and those benefits were to affect his prior burglary charges in indictments 2001-GS-01-303 through 309[.] There is no inference that can be gained from an intelligent reading of that document . . . That document cannot be interpreted in any reasonable way to affect charges that may result from actions and doings by anybody, including this Defendant, which led to the burglary of Mr[.] Hanna's home and his murder, but directly affects the charges that arose out of those prior mentioned indictments.

Further, it is clear from the proceedings here today that the consideration given for any benefits to be derived from that agreement was breached, as Mr–the Defendant herein, Mr[.] Compton, failed to cooperate truthfully, and further, the agreement does not say in any way that Mr[.] Compton could not be charged with the burglary of Mr[.] Hanna's home or his murder[.] The court invites any reviewer of this record to scrutinize Exhibit No[.] 2 and to derive from it such meaning as he or she may be able to obtain[.]

Concerning Tracy Black's activities, anything said to him was voluntarily said by this Defendant, Mr[.] Compton, and his presence–Mr[.] Compton's presence–subsequently in Columbia, also called Midlands, and Abbeville was at his request, at which time he made further statements, in addition to those made to Mr[.] Black, which were freely, voluntarily, and knowingly made and given with the advice of his rights to have an attorney present, which waiver of his rights to an attorney was freely, voluntarily, knowingly, and intelligently given, and there was no inducement by promise or promises, oral or written, for him to say or do anything[.] There's nothing which says that any individual cannot freely, voluntarily, knowingly, and intelligently waive his right to counsel[.] There's been no showing of any infirmity of mind or infirmity caused by ingestion of any substance or any other reason why this Defendant did not at any time clearly understand his rights to an attorney and clearly waive such rights, even if he had an attorney in this case[.] Any further statements were not made in reliance by Mr[.] Compton upon anything that is set out in Exhibit No. 2 or because of any unlawful activity or doings by Tracy Black or because of any breach of any statutory or judge-made rights or law by law enforcement authorities or Tracy Black.

The Court has thoroughly reviewed the record in this case with regard to this motion to suppress and considered the evidence presented here in this proceeding[.] The Court concludes that no promise or reasonable expectation of immunity to the charge of murder of the person of Johnny Hanna or the burglary of his home was given or expected by this Defendant[.] The Court concludes that the evidence shows by a preponderance or greater weight of the evidence that the Defendant was not deprived of his right to counsel at any time and was in no way caused to make

16

statements which may have incriminated himself against his clear intention and will[.] There's no protection provided to this Defendant by Rule 404, as the plea contemplated was already adjudicated, and reasonable means–quote, "Reasonable means," end of quote, which may be made to reduce the sentence already imposed was contemplated in the agreement[.] It's clear that there may be no benefits to this Defendant to protect him from the charges already made, but there was a presentation by the State that reasonable means would have been made[.] The reader is referred to the thorough examination of the solicitor by Mr[.] Grose with regard to that subject and the intentions of the State at the time of the agreement[.] Any other interpretation than that being stated by this Court at this time would allow the agreement to be considered so as to provide the Defendant an avoidance of the prosecution by this indictment for the murder of Johnny Hanna and–and–to also seek a reduction in the prior sentence for his admissions to the crimes of burglary in 2001-GS-01-303 through 309[.] The Court finds that there has been no compromise of Mr[.] Compton's constitutional rights or any other rights protected by law, statutory or judge made[.] The motion is denied[.]

(R. at 1506-10.)

Petitioner argued on direct appeal that the agreement dated July 12, 2000 "granted him immunity from prosecution on the charges in exchange for his cooperation with a police investigation." *State v. Compton*, 366 S.C. 671, 675, 623 S.E.2d 661, 663 (Ct. App. 2005). He also argued that the trial court erred (a) "in refusing to exclude his statements under Rule 410, SCRE, as the statements were made in the course of plea negotiations," (b) "failing to exclude his confessions on the grounds that they were made after a promise of leniency and were, therefore, not voluntary," (c) "failing to suppress his statements because the State violated his Sixth Amendment right to counsel by having Tracey Black initiate contact as a government informant," and (d) "limiting his ability to examine Solicitor Jones." *Id*. at 679-81, 623 S.E.3d at 665-66. The South Carolina Court of Appeals affirmed Petitioner's convictions and sentences. As to Petitioner's argument that the agreement "granted him immunity from prosecution on any related charges," the Court of Appeals stated,

> Looking at the agreement, there is nothing to evidence an understanding between the parties that Compton could not be prosecuted for the Hanna murder. It is generally recognized that immunity agreements and plea agreements are to be construed in accordance with general contract principles. *See U.S. v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) ("In the process of determining whether disputed plea

agreements have been formed or performed, courts have necessarily drawn on the most relevant body of developed rules and principles of private law, those pertaining to the formation and interpretation of commercial contracts."). Accordingly, this court should not read terms or conditions into the contract that the parties did not intend. *See Schulmeyer v. State Farm Fire & Cas. Co.*, 353 S.C. 491, 495, 579 S.E.2d 132, 134 (2003); *McPherson v. J.E. Sirrine & Co.*, 206 S.C. 183, 204, 33 S.E.2d 501, 509 (1945). The court must enforce an unambiguous contract according to its terms, regardless of the contract's wisdom or folly, or the parties' failure to guard their rights carefully. *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994). In *Harvey*, the court discussed the interpretation of immunity and plea agreements:

> Private law interpretive principles may be wholly dispositive in an appropriate case. For example, whether a written agreement is ambiguous or unambiguous on its face should ordinarily be decided by the courts as a matter of law. If it is unambiguous as a matter of law, and there is no suggestion of government overreaching of any kind, the agreement should be interpreted and enforced accordingly. Neither side should be able, any more than would be private contracting parties, unilaterally to renege or seek modification simply because of uninduced mistake or change of mind.

*Harvey*, at 300.

In the instant case, the agreement makes no mention of immunity from prosecution for any crime. In fact the word immunity, or any variation thereof, is nowhere to be found in the four corners of the document. "Prosecution" is mentioned only once in relation to the State's "prosecution" of Compton for perjury if he lied to investigators. The agreement is unambiguous. It clearly indicates the State's intention—to get reliable information that could assist in solving the murder case. Compton's intention is equally clear—to get a reduction in the sentences for his burglary convictions. The burglary convictions are specifically referenced by indictment numbers, and the reduction sought is set forth in specific terms. The agreement is simply a contract of cooperation between the parties. To characterize the agreement as something more would be to read into it terms that simply are not there. Furthermore, there is no argument by Compton that the investigators overreached or coerced him into making the agreement. It was entered into after Compton initiated contact with Sheriff Goodwin in the hopes of procuring a reduction on his already imposed burglary sentence. There is no indication the agreement contemplated the granting of immunity from prosecution on charges relating to the Hanna murder in exchange for Compton's testimony. Accordingly, the trial court did not err in refusing to quash the indictments brought against Compton based upon this agreement.

*Compton*, 366 S.C. at 677-78, 623 S.E.2d at 664-65.

As to Petitioner's argument that the court "erred in failing to exclude his confessions on the grounds that they were made after a promise of leniency and were, therefore, not voluntary," the South Carolina Court of Appeals stated,

> "The test for determining the admissibility of a statement is whether it was knowingly, intelligently, and voluntarily given under the totality of the circumstances. A statement induced by a promise of leniency is involuntary only if so connected with the inducement as to be a consequence of the promise." *State v. Owens*, 346 S.C. 637, 660, 552 S.E.2d 745, 757 (2001) (overruled on other grounds by *State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005)) (internal citations omitted).
>
> In this case, the record indicates Compton was never told his statements would not be used against him. Nothing brought out in the *Jackson v. Denno* hearing or in the arguments to quash the indictments indicated Compton made the statements involuntarily and based upon a promise of leniency. Additionally, he sought out the sheriff in order to make a deal to reduce his burglary sentence in exchange for information about a separate matter. Accordingly, we find the trial court properly concluded the statements were given knowingly and voluntarily by Compton and were properly presented to the jury for consideration.

*Compton*, 366 S.C. at 680, 623 S.E.2d at 666.

The undersigned recommends granting summary judgment to Respondent as to Ground One. The state court's rejection of this claim is not contrary to, or an unreasonable application of, clearly established federal law, nor did the adjudication result in an unreasonable determination of the facts. As indicated by the South Carolina Court of Appeals, nothing in this "plea agreement" indicates that Petitioner was ever told that his statements would not be used against him. In fact, there is evidence in the record that, at the time Petitioner entered into this agreement, he was also read his *Miranda* rights and signed a form acknowledging those rights. (R. at 476-83.) The record further contains evidence that Petitioner was advised of his *Miranda* rights on October 10, 2000, and again on October 25, 2000, before Petitioner spoke with officers. (R. at 704-08, 316-20.)

The only leniency promised in this agreement related to Petitioner's sentences on unrelated burglary convictions. The agreement provided that the State "agrees to reduce" the sentences on specified unrelated burglary charges "by all reasonable means," "if the state can reasonably determine that the statement and all other information has been given truthfully by the defendant Otis James Compton and said information does assist in the investigation of the death of Johnny Hanna

and result in an arrest." (R. at 1757.) However, that very same agreement also states that the "agreement **becomes null and void if the State determines** that the defendant Otis James Compton **has been untruthful in any representation** made to the State concerning the Murder and death of Johnny Hanna." (R. at 1757 (emphasis added).) The court found that Petitioner "failed to cooperate truthfully" with the investigation. Such a factual finding is "presumed to be correct"; Petitioner has the "burden of rebutting the presumption . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003); *cf. Wilson*, 352 F.3d at 860 ("These facts do not compel the credibility determination reached by the state court, but they certainly provide sufficient basis, for purposes of section 2254(d)(2), to support such a determination."). Here, Petitioner has not met his burden. There is evidence in the record that supports the state court's conclusion that Petitioner breached the agreement. Mr. Jones, the solicitor that signed this agreement, testified that Petitioner did not pass the polygraph test related to this investigation. (R. at 1479-80.) With Petitioner's breach of the agreement, the State had no further obligations. Accordingly, the undersigned recommends granting summary judgment to Respondent as to Ground One.

## B.    Ground Two

In Ground Two, Petitioner asserts that the South Carolina Court of Appeals "erred by holding Petitioner's statements to informant Tracey Black were not obtained in violation of Petitioner's Sixth Amendment right to counsel where Black initiated contact with Petitioner while he was a government agent, and while Petitioner was represented by counsel on the plea agreement with the state." (Dkt. No. 1-1 at 28 of 51.) Petitioner contends that "Tracey Black was used as an undercover agent to circumvent Petitioner's Sixth Amendment right to counsel." (*Id.* at 59 of 51.) Petitioner states, *inter alia*,

> Petitioner had been indicted, and indeed even convicted, of the burglaries involved in this case. Smithdeal represented Petitioner, Smithdeal was a party to the plea agreement, and Smithdeal's continued involvement in having Petitioner's burglary sentence reduced was anticipated. Petitioner testified to the obvious -- that he gave his statements to earn the "time cut" he sought throughout. Petitioner successfully got the state to agree to "time cut" provision his attorney reduced to writing in the plea agreement.

Joe Smithdeal was Petitioner's attorney on those burglaries, and Tracey Black therefore initiated contact with Petitioner in violation of his constitutional rights.

(*Id*.)

Tracey Black's involvement in the case has been detailed above and is therefore not repeated in the discussion of this ground. The South Carolina Court of Appeals discussed the argument set forth in Ground Two in its opinion; the court stated,

Compton contends the court erred in failing to suppress his statements because the State violated his Sixth Amendment right to counsel by having Tracey Black initiate contact as a government informant. We disagree.

"The Sixth Amendment right [to counsel] attaches only 'post-indictment,' at least in the questioning/statement setting." *State v. Council*, 335 S.C. 1, 15, 515 S.E.2d, 508, 515 (1999) (citing *Michigan v. Harvey*, 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990)). "The Sixth Amendment right does not attach simply because the defendant has been arrested or because the investigation has focused on him." *State v. Register*, 323 S.C. 471, 477, 476 S.E.2d 153, 157 (1996) (citing *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966)). Furthermore, South Carolina follows the federal constitutional rule that the Sixth Amendment right to counsel is offense-specific; the mere fact counsel is appointed in one matter does not invoke the right to counsel in another, unrelated matter. *State v. Owens*, 346 S.C. 637, 661, 552 S.E.2d 745, 758 (2001) (*overruled on other grounds by State v. Gentry*, 363 S.C. 93, 610 S.E.2d 494 (2005)).

In the instant case, Compton was not indicted for the charges related to the Hanna murder until after he provided information to Black. While he was represented on the unrelated burglary charges and at the making of the agreement, that fact does not give rise to a Sixth Amendment violation regarding information gathered about the Hanna murder. Accordingly, the trial court properly admitted evidence of Compton's statements at trial.

*State v. Compton*, 366 S.C. 671, 680-81, 623 S.E.2d 661, 666 (Ct. App. 2005).

The South Carolina Court of Appeals' rejection of the claim set forth in Ground Two is not contrary to, or an unreasonable application of, clearly established federal law, nor did the adjudication result in an unreasonable determination of the facts. In *Texas v. Cobb*, 532 U.S. 162 (2001), the Supreme Court granted certiorari to consider "whether the Sixth Amendment right to counsel extends to crimes that are 'factually related' to those that have actually been charged." *Cobb*, 532 U.S. at 166. The Court stated, *inter alia*,

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991), we explained when this right arises:

> "The Sixth Amendment right [to counsel] ... is offense specific. It cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.*, at 175, 111 S.Ct. 2204 (citations and internal quotation marks omitted).

Accordingly, we held that a defendant's statements regarding offenses for which he had not been charged were admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses. *See id.*, at 176, 111 S.Ct. 2204.

*Cobb*, 532 U.S. at 167-68.

The Court noted that some courts "have read into *McNeil*'s offense-specific definition an exception for crimes that are 'factually related' to the charged offense," but "[w]e decline to do so." *Id.* at 168 (citations omitted). The Court did hold, however, that "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test." *Cobb*, 532 U.S. at 173 (citing *Blockburger v. United States*, 284 U.S. 299 (1932)). Applying those rules to the case before it, the Court stated,

> At the time he confessed to Odessa police, respondent had been indicted for burglary of the Owings residence, but he had not been charged in the murders of Margaret and Kori Rae [Owings]. As defined by Texas law, burglary and capital murder are not the same offense under *Blockburger*. Compare Tex. Penal Code Ann. § 30.02(a) (1994) (requiring entry into or continued concealment in a habitation or building) with § 19.03(a)(7)(A) (requiring murder of more than one person during a single criminal transaction). Accordingly, the Sixth Amendment right to counsel did not bar police from interrogating respondent regarding the murders, and respondent's confession was therefore admissible.

*Cobb*, 532 U.S. at 172.

In the case *sub judice*, Joe Smithdeal was Petitioner's attorney on the unrelated burglary charges. It is true that Smithdeal signed the "plea agreement." (*See* R. at 1756-57.) But of course, Petitioner was attempting to obtain a sentencing reduction on those unrelated burglary charges. As the state court noted, Petitioner was not indicted on the charges at issue in the instant § 2254 petition

until *after* he provided information to Tracey Black. Accordingly, Petitioner is not entitled to relief on Ground Two. *See Cobb*, 532 U.S. 162; *cf. Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) ("Following being charged with kidnapping, Henderson did not have a Sixth Amendment right to counsel for capital child murder when each of the attorneys acted on her behalf prior to her being so charged. Accordingly, she may not, for the pre-trial conduct at issue, claim IAC for that charge."). Accordingly, the undersigned recommends granting summary judgment to Respondent as to Ground Two.

## C.    Ground Three

Petitioner asserts in Ground Three that the South Carolina Court of Appeals "erred by ruling the trial court did not impermissibly limit his cross-examination of Solicitor Jones regarding his prior testimony at a pre-trial hearing." (Dkt. No. 1-1 at 30 of 51.) Petitioner contends the trial court's "limitation on this permissible confrontation" violated his "Constitutional right to confrontation as protected by the Sixth and Fourteenth Amendments" where the solicitor "admitted in that testimony that he contemplated Petitioner's attorney being involved in the future to fulfill the terms of the plea agreement and therefore, the solicitor's testimony at the prior hearing was admissible as a prior inconsistent statement." (Dkt. No. 1-1 at 30 of 51.)

During Petitioner's trial, Solicitor Jones testified as follows:

Q. And the statement is only about the Hanna murder investigation?

A. Well, he wasn't charged with it[.] If he's not charged with it, then Smithdeal is not representing him on it[.] Smithdeal is representing him to the extent that he wanted Smithdeal there, the lawyer that represented him on the burglary cases to be a witness to what he was doing and saying in his effort to comply with his end of the deal which was to be honest and tell the truth[.]

Q. Are you saying that somebody can not be represented by a lawyer when there's no charges?

A. I'm saying he wasn't in this case[.]

Q. Well, did he have a lawyer sign that statement?

A. I'm saying Smithdeal did not – he wasn't charged and Smithdeal was not representing him on charges in this case[.]

Q. Well, you contemplated Joe Smithdeal being involved in the future, didn't you?

A. Contemplated Joe Smithdeal being involved in the future?

Q. Yes[.]

A. I didn't know whether he would or wouldn't be[.] I didn't know whether he would or wouldn't be[.]

MR. MCMAHON: Your Honor, I would object to contemplation of the Solicitor in the future of anything after 7/12/00[.] Contemplation of the Solicitor in the future wouldn't be relevant[.] What's relevant and I have to object whether it's relevant or not, statements or such statements of Defense Exhibit No. 2 [the plea agreement.] I don't think what he contemplates in the future is relevant at all[.]

THE COURT: Mr. Grose, that would require the witness to speculate[.] The objection is sustained[.]

MR. GROSE: Your Honor, may I take up a matter of law?

(R. at 845-47.)

Outside the presence of the jury, counsel for Petitioner argued that Solicitor Jones testified in a previous hearing that if the "plea agreement" had been fully complied with, Jones would have encouraged Smithdeal to file a post-conviction relief application." (*See* R. at 850; *see also* R. at 1218-19.) The trial judge denied counsel's request, and the examination of Solicitor Jones was concluded. (*See* R. at 853-55.)

The South Carolina Court of Appeals addressed Petitioner's claim that the trial court erred in limiting his ability to examine Solicitor Jones; the court stated,

Compton contends the trial court erred in limiting his ability to examine Solicitor Jones. We disagree.

"The Sixth Amendment rights to notice, confrontation, and compulsory process guarantee that a criminal charge may be answered through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence." *State v. Graham*, 314 S.C. 383, 385, 444 S.E.2d 525, 527 (1994). "This does not mean, however, that trial courts conducting criminal trials lose their usual discretion to limit the scope of cross-examination." *State v. Aleksey*, 343 S.C. 20, 33–34, 538 S.E.2d 248, 255 (2000).

24

Compton's counsel sought to elicit testimony from Solicitor Jones to support the theory that the agreement called for Compton to be immune from prosecution in the Hanna murder. Counsel also sought testimony about Jones' belief that Compton's attorney would continue to be involved in the case. Such testimony was not relevant to the issue of Compton's guilt or innocence. The jury was not entitled to determine whether the agreement provided transactional immunity, as that was a question of contract interpretation before the court. Additionally, the statement sought to be admitted to impeach the solicitor, while not relevant, was also based upon pure speculation that counsel would continue in his involvement. As such, we find no error on the part of the trial court in limiting the examination of Solicitor Jones or in refusing to allow Compton to impeach Jones using a prior statement that was purely speculative.

*State v. Compton*, 366 S.C. 671, 681-82, 623 S.E.2d 661, 666-67 (Ct. App. 2005).

The undersigned recommends concluding that Petitioner is not entitled to habeas relief on Ground Three. In *Delaware v. Van Arsdall*, 475 U.S. 673 (1986), the Supreme Court stated,

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." The right of confrontation, which is secured for defendants in state as well as federal criminal proceedings, *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965), "means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S., at 315, 94 S.Ct., at 1110. Indeed, " '[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination*.' " *Id*., at 315–316, 94 S.Ct., at 1110 (quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940)) (emphasis in original). Of particular relevance here, "[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis*, *supra*, at 316–317, 94 S.Ct., at 1110 (citing *Greene v. McElroy*, 360 U.S. 474, 496 79 S.Ct. 1400, 1413, 3 L.Ed.2d 1377 (1959)). It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 295, 88 L.Ed.2d 15 (1985) (per curiam) (emphasis in original).

*Van Arsdall*, 475 U.S. at 678-79.

25

In the case *sub judice*, Petitioner was permitted to call Solicitor Jones as a witness; he simply was not permitted to have the Solicitor testify concerning his "contemplations" for the future. In short, the trial judge simply declined to allow the Solicitor to speculate about future events. The undersigned discerns no unreasonable application of clearly established federal law in such a limitation. *See Van Arsdall*, 475 U.S. at 679 ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination . . . ."); *see also Quinn v. Hayes*, 234 F.3d 837, 840-41, 852 (4th Cir. 2000) (concluding "the state supreme court's limitation of [the petitioner's] right to present impeachment evidence regarding [the victim's] other accusations of sexual assault is neither contrary to nor an unreasonable application of federal law as determined by the Supreme Court" where the petitioner sought to cross-examine the victim "about the fact that [she] had made similar accusations of sexual abuse against two of her step-brothers and her grandfather," "impeach[ing] the minor victim's general credibility by attacking the victim's allegations of sexual abuse by others through cross-examination of the victim as to each alleged specific act and by presenting the testimony of each alleged perpetrator denying his alleged conduct").

Furthermore, even if the limitation of the examination of Solicitor Jones was erroneous, Petitioner is still not entitled to federal habeas relief. In *Van Arsdall*, the Court held "that the constitutionally improper denial of a defendant's opportunity to impeach a witness, like other Confrontation Clause errors, is subject to *Chapman* harmless-error analysis." *Van Arsdall*, 475 U.S. at 684 (citing *Chapman v. California*, 386 U.S. 18 (1967)). The Court stated,

> The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.* (citations omitted). Even if counsel had been able to ask Solicitor Jones about his prior statement that he would have encouraged Smithdeal to file a post-conviction relief application, it is difficult to envision any significant alteration to Petitioner's trial. As the Court of Appeals noted, Solicitor Jones' testimony had nothing to do with whether Petitioner committed the crimes at issue. Accordingly, the undersigned recommends granting summary judgment to Respondent as to Ground Three.

**D.    Ground Four**

In Ground Four, Petitioner contends that Attorney Smithdeal was constitutionally ineffective in failing "to obtain a definitive immunity agreement with the State before permitting the Petitioner to provide a statement to police concerning the murder of the victim." (Dkt. No. 1-1 at 34 of 51.) This claim is related to the "plea agreement," which has been set forth in detail above. Petitioner states, *inter alia*,

> The "plea agreement" did not include any express promise made by the State to not prosecute the Petitioner for the murder of the victim. Furthermore, the "plea agreement" did not state exactly how the State would reduce the Petitioner's sentence, only that the State would use its best efforts to do so. The so-called "plea agreement" in fact had no provisions relevant to any future plea. Thus, Attorney Smithdeal, allowed Petitioner to sign an agreement for him to provide law enforcement with a statement concerning his knowledge concerning a murder, without taking any steps to insure that the agreement included a provision protecting Petitioner against the use of any information provided pursuant to that agreement against him in a court of law.

(Dkt. No. 1-1 at 36-37 of 51.)

The United States Supreme Court has said that a meritorious ineffective assistance of counsel claim must show two things: first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687-96 (1984). A court's evaluation of counsel's performance under this standard must be "highly deferential," so as to not "second-guess" the performance. *Id.* at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the

challenged action might be considered sound trial strategy." *Id.* (internal quotation marks and citation omitted); *see also Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008); *Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297–99 (4th Cir. 1992); *Roach v. Martin*, 757 F.2d 1463, 1467 (4th Cir. 1985). In order to establish the second prong of *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A "reasonable probability" has been defined as "a probability sufficient to undermine confidence in the outcome." *Id.* While *Strickland* itself is a deferential standard, when both § 2254(d) and *Strickland* apply, "review is doubly" deferential. *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Indeed, when § 2254(d) applies, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

The PCR court addressed this claim of ineffective assistance of counsel as follows:

> Compton alleges that Smithdeal was ineffective for failing to obtain a specific immunity agreement for the murder charge and for failing to assert Compton's Fifth Amendment right to an attorney for all future conversations with Compton[.] He also claims that he never would have made the incriminating statements if Smithdeal had taken either action, and that consequently the State would not have been able to prosecute him[.]

### 1. Specific Immunity Agreement

Compton argues that Smithdeal should have insisted on a specific immunity provision in the July 12, 2000 'plea agreement.' Smithdeal testified that he did speak with Solicitor Jones about immunity, but that Solicitor Jones was not willing to consider it[.] Smithdeal further testified that as counsel for Compton on pending burglary charges, and per Compton's request to help him get his existing sentence on prior burglary convictions reduced, he was trying to get the best deal he could for Compton on the charges for which he *did* represent Compton[.] He stated that, regardless, he could not have negotiated a deal for Compton on the murder charge, because Compton was not charged with murder[.] Furthermore, Solicitor Jones testified that he could not recall a single instance during his tenure as Solicitor when he granted a defendant total immunity in exchange for information.

Compton contends he never would have given information for which he could be prosecuted if he knew the July 12, 2000 plea agreement did not afford him immunity. First, the agreement never uses the word immunity, or any variation thereof, and therefore Compton cannot credibly claim he was lulled into believing the

agreement prevented the State from prosecuting him for murder[.] Second, it cannot be surmised that Compton only gave statements because he believed the July 12th plea agreement offered immunity considering that Compton began voluntarily talking with law enforcement again on August 13, 1999–within one week of the murder and almost a year before entering into the agreement. Indeed, in the August 13, 1999 statement Compton had already placed himself at the scene of the crime. <u>See</u> Tr p 302, lines 1-25, p 563, lines 19-25[.]

Compton made another voluntary statement on November 30, 1999 well before entering into the plea agreement, in which he gave officers the names of Robert Compton and Shane Rice[.] On July 12, 2000, Compton initiated contact with law enforcement again, and gave another voluntary statement, telling the officers that Shane Rice confessed to him that he (Shane) and Robert burglarized the Hanna's home and killed Johnny Hanna. <u>See</u> Tr p 976, line 18-p 977, line 24[.] Compton gave further voluntary statements on October 9-10, 2000 and on October 25, 2000[.] In addition, several witnesses testified at trial about incriminating statements Compton made to fellow inmates, in addition to law enforcement, both before and after entering into the July 12, 2000 agreement[.] Moreover, every time Compton gave a statement to law enforcement, he did so after being advised of his <u>Miranda</u> rights, particularly that anything he said could be used against him in a court of law.

Therefore, Smithdeal was not ineffective for failing to obtain immunity for Compton[.] Even if Smithdeal were found to have rendered ineffective assistance during the negotiations of the plea agreement, Compton was not prejudiced by Smithdeal's alleged deficient performance[.] Smithdeal testified that he told Compton not to talk with the police, but that Compton insisted on giving a statement[.] One can infer that this is the same advice Smithdeal would have given Compton if he had been more formally retained or appointed[.] Nonetheless, despite Smithdeal's advice, Compton entered into the July 12, 2000 plea agreement and gave a statement[.] That statement was preceded by and followed by several other incriminating statements, all initiated and made voluntary by Compton. Clearly, Smithdeal could not prevent Compton from waiving his rights, and could not protect Compton from the consequences of his voluntary statements[.] Thus, Smithdeal's alleged failure to do so did not prejudice Compton[.]

(R. at 2045-47.)

The state court's rejection of this ineffective assistance of counsel claim is not contrary to, or an unreasonable application of, clearly established federal law, nor did it result in an unreasonable

29

determination of the facts. As noted by the PCR court, Smithdeal testified that he believed he spoke with the solicitor about immunity. (R. at 1893-94.)[2] Smithdeal further testified as follows:

> Q. Did you have [a] discussion with your client about the fact that it would ill suit him or his best interest to get a fifteen year sentence reduced to seven and a half years if he exposed himself to a thirty year to life sentence for murder?
>
> A. Yes[.] We specifically talked about what I mentioned earlier, that it was my opinion that the police were looking to jail him for the Hannah murder and that this deal that Otis wanted to do, in fact he was insisting that we do it against my advice, that it may never work, it may never come to pas[s], even if he gave truthful testimony, because I told him that they could find anything that he said wrong, anything that they disagreed with, any piece of evidence that didn't match up with his testimony and say the deal is off[.] There would be a myriad of other reasons why the deal would never go through[.]
>
> Q. And more specifically did you make sure that he understood that there were no provisions in that agreement whatsoever that protected him from prosecution for the murder as a co-conspirator in the death of M[r.] Hannah?
>
> A. Yes, yes. . . .

(R. at 1894-95.) Smithdeal testified that he "advised [Petitioner] of the fact that they were fishing, they were looking for something against him, they would use this evidence against him." (R. at 1893.) Smithdeal further testified that he "insisted to Otis, 'You keep your mouth shut and, you know, this thing will leave you alone.'" (R. at 1899.) Smithdeal testified that "Otis wanted to go forward, okay, Otis wanted to do this deal[.]" (R. at 1897.) He stated, "[Otis] really wanted to do it and it wasn't my decision, really[.]" (R. at 1899.) Smithdeal further testified that he explained accomplice liability to Petitioner, explaining that "even if [he] didn't go into the house, even if he wasn't at all physically involved in the robbery or killing, that he could still be charged with it." (R. at 1900-02.) According to Smithdeal, Petitioner "kept insisting" that he "wasn't even there, wasn't even on the property, . . . wasn't even in the neighborhood." (R. at 1902.)

_____

[2]Solicitor Jones testified that although he did not recall whether Smithdeal brought up the topic of immunity, Jones "would not have agreed to it" on July 13, 2000. (R. at 1872; *see also* R. at 1874.) He also said, however, that if the case had remained open many months later, and the Sheriff and family asked him to do it, he would have considered it, though he did not know whether he would have in fact done it. (R. at 1875-78.) Jones testified that in all of his previous years as a solicitor, he had never offered complete immunity in exchange for information. (R. at 1875-76.)

If the solicitor was unwilling to offer Petitioner immunity for information, counsel surely cannot be deemed ineffective for failing to obtain it. Moreover, the record supports the finding that Smithdeal's failure to obtain an immunity agreement did not prejudice Petitioner. The state court found no prejudice because Smithdeal told Petitioner not to talk to the police, but Petitioner insisted on doing do. Petitioner is not entitled to habeas relief on this claim, and the undersigned therefore recommends granting summary judgment to Respondent as to Ground Four.

**E.     <u>Ground Five</u>**

Petitioner asserts in Ground Five that Attorney Smithdeal was ineffective in failing "to assert the Petitioner's right to remain silent and [in] fail[ing] to establish his position as counsel for the Petitioner in connection with anything relating to this homicide and any charges which might be brought relating to it." (Dkt. No. 1-1 at 39 of 51.) Petitioner states, *inter alia*,

> The Petitioner's allegations of ineffective assistance of counsel prior to trial turn on Joseph Smithdeal's failure to take any action to protect the Petitioner during and after the July 12, 2000, meeting with Solicitor Jones and the police. In particular, the Petitioner alleges that Attorney Smithdeal was ineffective for failing to obtain a specific immunity agreement for the murder charge and was ineffective for failing to assert the Petitioner's Fifth Amendment right to an attorney for all future conversations with the Petitioner. Had Attorney Smithdeal taken either action, it is highly likely that either the Petitioner would never have given the incriminating statements that led to his prosecution or the State would not have been able to prosecute him. . . .

> While it is clear that Attorney Smithdeal was uncomfortable with the Petitioner giving a statement to further his end of the "plea agreement," and that he conveyed that dislike of the situation to the Petitioner, Attorney Smithdeal failed to take any precautions to ensure that the Petitioner could be protected if the State attempted to prosecute the Petitioner for the victim's murder. . . . Inasmuch as there was some suggestion that law enforcement had no duty to inform Attorney Smithdeal when they were about to conduct future interviews with the Petitioner because Attorney Smithdeal was the Petitioner's attorney on the previous burglaries, but not this homicide case, the Petitioner further alleges that Attorney Smithdeal was ineffective for failing to insist that the agreement contain a clause acknowledging that he was the Petitioner's lawyer concerning the homicide matter. Alternatively, Attorney Smithdeal could have refused to participate in the drafting and execution of this agreement until he took steps to formalize his representation of the Petitioner in connection with this case, or saw to it that another attorney was either hired or appointed.

Similarly, Attorney Smithdeal's failure to inform law enforcement, prior to October 13, 2000, that the Petitioner was not to be spoken to without first speaking to him—thereby invoking the Petitioner's Fifth Amendment right to counsel—was deficient performance. Attorney Smithdeal acknowledged that he had great concerns with the State's desire to "pin" this crime on the Petitioner. Thus he admitted that he had reason to fear that the police were going to try to implicate Petitioner as a participant in this homicide despite the Petitioner's statement that he was not present at the scene of the crime. Testimony at trial would establish that at the time this agreement was being drafted, Attorney Smithdeal knew that the Petitioner had been questioned about this homicide in the past and that he was the chief suspect when the killing first happened. Furthermore, it is not as if Attorney Smithdeal had some objection to taking such action, inasmuch as he took the very same action after he was informed by trial counsel on October 13, 2000, that the Petitioner was being interviewed by the police. The Petitioner asserts that it should not have taken months and prompting from another attorney for Attorney Smithdeal to take the appropriate action to protect the Petitioner. Attorney Smithdeal's performance was clearly deficient.

(Dkt. No. 1-1 at 40-43 of 51.) Petitioner contends he was prejudiced because had Smithdeal "explicitly invoked the Petitioner's Fifth Amendment right to counsel after the July 12, 2000, statement was given, it would have strengthened the Petitioner's later arguments that the statements made without benefit of counsel were not admissible at trial[, i]f in fact they were made at all." (*Id.* at 43 of 51.) Petitioner further asserts that if those statements had been found inadmissible at trial, it is likely he would not have been prosecuted for the crimes at issue. (*Id.*)

The PCR court addressed this claim as follows:

Compton alleges that Smithdeal was ineffective for failing to obtain a specific immunity agreement for the murder charge and for failing to assert Compton's Fifth Amendment right to an attorney for all future conversations with Compton[.] He also claims that he never would have made the incriminating statements if Smithdeal had taken either action, and that consequently the State would not have been able to prosecute him[.]
. . .

### 2. Fifth Amendment Right to Counsel

The sojourn of Compton's Fifth Amendment right is circuitous, but essentially simple[.] Compton undoubtedly invoked his Fifth Amendment rights when he requested that Mr. Smithdeal be present at the July 12, 2000 meeting with police. From that point, Edwards v. Arizona, 451 U.S. 477 (1981) prevented law enforcement from initiating contact with Compton unless he was accompanied by counsel. As Edwards explained[,]

When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by

32

showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights[.] [He] is not subject to further interrogation until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. 451 US at 484-85[.]

Indeed, the police could not approach him about any offense unless counsel was present[.] McNeil v. Wisconsin, 501 U.S. 171, 177 (1991)[.] Any attempt by the police to surreptitiously approach Compton and secure a waiver of his Fifth Amendment rights would have been presumptively invalid[.] See Minnick v. Mississippi, 498 US 146 (1990)[.]

These "prophylactic" rules, however, do not apply if Compton himself initiated contact with police[.] For while Miranda and McNeil expressly prohibit the police from "badgering" a criminal suspect who has previously embraced the protections of the Fifth Amendment, Michigan v. Harvey, 494 US 344, 350 (1990), nothing prevents the suspect from independently approaching the police[.] See Miranda v. Arizona, 384 US 436 (1966)[.] To hold otherwise would effectively declare that an individual's invocation of Fifth Amendment rights is per se irrevocable[.] Id[.] Miranda did not prohibit voluntary statements, it only provided that a suspect be warned of and voluntarily waive his Fifth Amendment rights before his custodial statement could be considered voluntary and admissible in court[.] To show that Compton voluntarily waived his Fifth Amendment right after invoking it, the State must prove by the greater weight of the evidence that Compton (1) initiated further communications, exchanges or conversations with the police and (2) voluntarily, knowingly and intelligently abandoned his right to counsel[.] Oregon v. Bradshaw, 462 US 1039 (1983)[.]

The record easily demonstrates that Compton, exercising his free will, reopened dialogue with police about the Hanna murder[.] In addition, after he sought the audience with police he knowingly, and intelligently and voluntarily waived his Miranda rights to counsel[.] His decision to discard his rights was the product of a free and deliberate choice, made with full awareness of both the nature of the rights and the consequences of abandoning them[.] Moran v. Burbine, 475 US 412 (1986)[.]

Because Compton on his own initiative voluntarily approached the police seeking to give subsequent statements–and because he was thereafter specifically advised of his Miranda rights and voluntarily chose to waive them–the Fifth Amendment was not offended.

To escape this conclusion, Compton contends that Mr. Smithdeal was ineffective for not expressly advising police that he represented Compton for all purposes related to the murder investigation[.] Had Smithdeal done so, Compton alleges that the police would never have been allowed to take any subsequent statement from him[.]

Among the flaws embedded in this argument is the stubborn fact that Smithdeal was not retained or appointed to represent Compton on the yet to be lodged murder charge[.] It must be remembered that, at that point, Smithdeal was representing Compton on unrelated burglary charges[.] Because Smithdeal never formed an attorney-client relationship with Compton to cover the murder charge, it is unclear how Compton can allege his Sixth Amendment right to the effective

33

assistance of counsel has been infringed[.] The Sixth Amendment is offense specific and its rights do not attach until a defendant is formally charged[.]

Compton cites Smithdeal's letter to Sheriff Goodwin, dated October 13, 2000, to support his position that Smithdeal could have asserted Compton's Fifth Amendment rights before that time, and therefore should have done so sooner[.] This letter was clearly Smithdeal's best effort at protecting Compton, despite the fact that he did not represent him on the murder charge, and despite the fact that the law does not allow a third party to invoke Fifth Amendment rights on behalf of another[.] Close analysis reveals that any attempt by Smithdeal to more formally invoke Compton's Fifth Amendment rights would have been superfluous[.] As noted above, Compton unambiguously claimed his Fifth Amendment right on July 12, 2000, which was as a matter of law a blanket assertion for any criminal matters[.] See McNeil, 501 US at 177 ("Once a suspect invokes the Miranda right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present") (citing Arizona v. Roberson, 486 US 675 (1988) (emphasis in original))[.] There was nothing Smithdeal could have done to further establish Compton's Fifth Amendment rights, particularly when Compton had announced he was waiving them[.]

The State contends that Smithdeal could not anticipatorily invoke Compton's Fifth Amendment rights for future police interrogations[.] Compton counters that his October 2000 statements would have been deemed inadmissible as fruit of the poisonous tree "had Smithdeal ensured that the police knew that the invocation was anticipatory[.]" Reply Brief at 2[.]

Both the State and Compton miss the mark[.] The Supreme Court has hinted–but never flatly held–that a suspect cannot anticipatorily invoke his Fifth Amendment rights[.] McNeil, 501 US at 182 n 3 (dicta). Other courts, however, have ruled that an accused–much less counsel–cannot invoke his Fifth Amendment right unless he is in the throes of custodial interrogation or such interrogation is imminent[.] State v. Hambly, 745 NW2d 48 (Wis 2008) (collecting cases), See Alston v. Redman, 34 F3d 1237 (3d Cir 1994), United States v. LaGrone, 43 F3d 332 (7th Cir 1994), United States v. Grimes, 142 F3d 1342 (11th Cir 1998)[.] This court need not address the validity or scope of anticipatory invocation, for Compton is correct that he effectively claimed his Miranda rights on July 12, 2000[.] What Compton is now claiming, however, is that Smithdeal was somehow incompetent for not attempting to re-invoke the very rights that Compton had voluntarily abandoned[.] This syllogistic argument chases its own tail, and has no basis in logic or precedent[.]

As the credible evidence demonstrates, Compton spurned Smithdeal's advice to remain silent and insisted on talking to police[.] And he did not seek Smithdeal's counsel (or the assistance of any lawyer) after that time, despite being repeatedly given Miranda warnings that reminded him he had the absolute right to counsel and to remain silent[.]

Statements that are freely and voluntarily given are of course admissible[.] Miranda, 384 US at 476[.] Furthermore, it is well settled that the Fifth Amendment privilege against self-incrimination is personal and may not be invoked by, or on behalf of, a third person[.] Moran v. Burbine, 475 US 412 (1986), State v. Hughes, 328 SC 146, 493 SE2d 821 (1997), United States v. Wise, 603 F2d 1101 (4th Cir.

1979) (recognizing that Fifth Amendment rights are personal and cannot be vicariously asserted)[.]

(R. at 2045-51.)

The undersigned recommends granting summary judgment to Respondent as to Ground Five. The state court's rejection of this claim of ineffective assistance of counsel is not contrary to, or an unreasonable application of, clearly established federal law, nor did the adjudication result in an unreasonable determination of the facts. Although Smithdeal represented Petitioner for the purposes of the "plea agreement," he never represented Petitioner on any charges at issue in the case *sub judice*. And as noted above, the Sixth Amendment is offense specific. *See Texas v. Cobb*, 532 U.S. 162 (2001). If the right to counsel had not attached yet, it is difficult to see how counsel could be ineffective at that stage. *See Henderson v. Quarterman*, 460 F.3d 654, 664 (5th Cir. 2006) ("Following being charged with kidnapping, Henderson did not have a Sixth Amendment right to counsel for capital child murder when each of the attorneys acted on her behalf prior to her being so charged. Accordingly, she may not, for the pre-trial conduct at issue, claim IAC for that charge."); *see also Philmore v. McNeil*, 575 F.3d 1251, 1255-59 (11th Cir. 2009) (rejecting claim that attorney "deprived [the petitioner] of the effective assistance of counsel prior to his being charged for Perron's murder" where the petitioner alleged the attorney, "without first conducting any independent investigation or securing a concession, . . . foolishly advised [the petitioner] to cooperate with the police and give statements in counsel's absence," stating, "During the time period that [the attorney's] representation was allegedly deficient, [the petitioner] had been charged only with armed trespass and the Indiantown bank robbery. There had been no formal charge, preliminary hearing, indictment, information, or arraignment against [the petitioner] for his involvement in Perron's murder. Under the *Blockburger* test, the crimes of armed trespass and third-degree grand theft are different offenses from first-degree murder because they require proof of different facts. [The attorney's] challenged representation therefore occurred before [the petitioner's] Sixth Amendment right to counsel had attached with respect to Perron's murder. Absent a Sixth Amendment right to

counsel, there can be no violation of the Sixth Amendment right to the effective assistance of counsel." (citations omitted)).

Furthermore, the state court found that "[a]s the credible evidence demonstrates, Compton spurned Smithdeal's advice to remain silent and insisted on talking to police[.]" (R. at 2051.) This factual finding on credibility is "presumed to be correct"; Petitioner has the "burden of rebutting the presumption . . . by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Wilson v. Ozmint*, 352 F.3d 847, 858 (4th Cir. 2003). He has not done so. The evidence in the record fully supports the state court's conclusion that Petitioner waived his *Miranda* rights and spoke to the police, despite Smithdeal's advice for Petitioner *not* to talk to the police. Accordingly, the undersigned recommends concluding that Petitioner is not entitled to federal habeas relief as to Ground Five.

## F.    **Ground Six**

In Ground Six, Petitioner contends trial counsel was ineffective in failing "to object to the State's use of the Petitioner's prior burglary convictions." (Dkt. No. 1-1 at 43 of 51.) Petitioner contends that during a motions hearing on November 14, 2002, defense counsel indicated that they would need to discuss the admissibility of Petitioner's prior burglary convictions. (Dkt. No. 1-1 at 44 of 51.) He asserts, however, that "no motion to address the admissibility of the prior burglaries was ever taken up, and . . . the underlying facts of the prior burglaries, and their similarities to this crime, were eventually admitted at trial." (*Id.*)

The PCR court addressed this claim as follows:

> Compton claims that Mr[.] Grose should have requested an order from the trial judge to prohibit the State from referencing his prior burglary convictions during his trial on the Hanna burglary and murder[.] Pointing to the record, Compton notes that the fact that he had prior burglary convictions "was explicitly stated no less than fourteen times, including multiple occasions where the witnesses explained that [Compton] was the primary suspect because of the similarities between prior burglaries and the instant offense[.]"
>
> At the PCR hearing, Mr[.] Grose testified that while he moved in limine to limit references to prior burglary convictions, he did not pursue the issue because he realized that a main plank of his defense theory was that the plea agreement afforded Compton immunity from prosecution, and that statements made by Compton were involuntary due to police trickery[.] Therefore, Mr[.] Grose reasoned that the jury would inevitably learn of Compton's previous burglary convictions[.]

While conceding that this may have been valid trial strategy, Compton asserts that competent counsel would have sought a ruling from the trial court redacting the exact nature of his prior convictions, thereby minimizing the prejudicial impact[.] Compton notes this approach of sanitizing a defendant's admissible record was specifically encouraged by <u>State v. Elmore</u>, 368 SC 230, 239 n 5, 648 SE2d 271 (Ct App 2006) and <u>Green v. State</u>, 338 SC 428, 527 SE2d 98 (2000)[.]

While there may be instances where the <u>Elmore</u> approach can benefit a defendant, merely limiting references to a defendant's prior record to unspecified felonies does not in all cases magically remove any undue prejudice[.] Indeed, by not disclosing the exact nature of the prior crimes, the jury's imagination is free to roam and the resulting speculation may enhance rather than blunt the prejudice that concerned <u>Elmore</u>[.]

This court is not persuaded that the trial judge would have granted a motion to redact Compton's prior burglary convictions[.] To be sure, inherent prejudice flows from using similar prior convictions for impeachment[.] It follows that the more similar the prior conviction is to the crime charged, the more prejudice ensues[.] This is what <u>State v. Colf</u>, 337 SC 622, 525 SE2d 246 (2000) reminds us, and why trial courts are required to conduct an on-the-record balancing test encompassing numerous factors[.] <u>Id</u>[.]

Yet, SCRE 609 mandated that once Mr[.] Compton took the stand his prior burglary convictions "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused[.]" This court cannot say that, after applying this rule and performing the <u>Colf</u> calculus, Judge Saunders would have chosen to exclude or sanitize Compton's burglary record[.]

The record also supports the admission of prior burglaries as proof of identity[.] <u>See</u> <u>Gillion</u>, 373 SC at 609-610 (prior burglaries committed by defendant admissible to prove identity), <u>State v. Good</u>, 308 SC 308, 417 SE2d 640 (Ct App 1992)[.] Moreover, they were allowable under the common scheme or plan exception of SCRE 404(b)[.] It would have been reasonable for a trial judge utilizing his discretion to conclude that there was a close degree of similarity between the Hanna crimes and the prior burglaries, and that, pursuant to SCRE 403, such evidence was not substantially outweighed by the danger of unfair prejudice[.] <u>State v. Wallace</u>, 384 SC 428, 683 SE2d 275 (2009) (establishing test for admissibility of "common scheme or plan" bad act evidence)[.] Given the significant factual similarity between Compton's prior burglaries and the Hanna burglary, it is reasonably likely that Compton's objections to such evidence would have been overruled[.] Chief Johnson testified about the similarities at trial[,] the proximity of the victim's house to where the majority of the other burglaries occurred, when the burglaries occurred, the fact that the burglaries almost stopped while Compton was incarcerated, how the door was pried open and window broken, and the items that were taken[.]

In any event, even assuming Grose was deficient in failing to object to the introduction of Compton's prior burglary convictions, the error did not contribute to the verdict[.] Among its proof, the State had Compton's sworn confession that placed him at the scene of the crime, and his boastful remarks to Black and other fellow

prisoners concerning his participating in the Hanna crime[.] While there was no physical evidence, the record was replete with proof of Compton's guilt[.]

Furthermore, Judge Saunders provided a limiting instruction to the jury that evidence of prior convictions went only to witness credibility and "is not evidence of guilt of any of the matters contained in this indictment[.]" T 1147[.]

Mr. Grose testified that by the time he was appointed to Compton's case, the plea agreement already existed[.] He stated that he had to decide how to strategically handle the agreement, particularly given that the trial court had deemed it admissible[.] He further stated that because Compton had given inconsistent statements and had recanted others was because he was trying to get the benefit of his plea agreement[.] Mr. Grose's strategy was to maintain that his client was not at the scene, point out holes and inconsistencies in the State's case, and argue that any statement Compton gave stating he was involved in the murder was induced by the State's illusory promise in the plea agreement to reduce his sentence on the other burglaries[.]

Defense counsel clearly articulated a valid defense strategy, particularly in light of Compton's numerous voluntary, yet inconsistent statements, and given the fact that the plea agreement already existed by the time defense counsel was appointed to Compton's case[.] This strategy was the product of reasonable and experienced professional judgment, made after a thorough investigation[.] Cf Wiggins v. Smith, 539 US 510 (2003).

Above all, Compton has failed to show any prejudice that may have resulted from defense counsel's alleged deficient representation[.] Any error in counsel's alleged failure to object to the introduction of Compton's burglary convictions was harmless, given other overwhelming evidence of Compton's guilt[.] See State v. Keenon, 356 SC 457, 590 SE2d 34 (2003)[.] Compton has presented no evidence that his counsel's representation was so deficient that the outcome would have been different had he objected to admission of Compton's prior bad acts[.]

(R. at 2054-57.)

The state court's rejection of this claim of ineffective assistance of counsel is not contrary to, or an unreasonable application of, clearly established federal law, nor did the adjudication result in an unreasonable determination of the facts. As noted by the PCR court, counsel was tasked with formulating a strategy that would encompass and address the plea agreement as well as Petitioner's inconsistent statements to law enforcement. (*See* R. at 1961 (testifying "there were some problems" with the case due to the "plea agreement").) Counsel testified that his strategy was to "introduce that agreement that referenced the burglaries." (R. at 1982.) He testified, however, that he "had not pursued the idea of redacting the agreement." (R. at 1985.) He stated that when his strategy of having the statement suppressed did not work, his second strategy was "to ask the jury not to believe the

statement beyond a reasonable doubt because of the circumstances under which it was obtained." (R. at 2001.) Counsel further stated "that's . . . reflected by the record that was the strategy at trial." (R. at 2001.) Counsel testified that since Petitioner's statements were in front of the jury, "if there was any chance of them acquitting him . . . they needed to hear from him about his explanation about those statements and why he made them." (R. at 2006.) In his closing argument, counsel argued that the jury should not believe the statements. (*See, e.g.*, R. at 1090.) He also argued that Petitioner entered into the agreement in the hope of getting a "reward" with respect to his burglary sentences. (*See* R. at 1101.) He asked the jury to "pay attention to whatever promises were made [to Petitioner] and the manner in which [the police] went about trying to solve this case." (R. at 1113-14.)

As indicated by the testimony and by the state PCR court's decision, trial counsel's strategy necessarily involved the "plea agreement," which referenced the burglaries. Moreover, counsel used the offer of a "reward" in the "plea agreement" in an effort to convince the jury to find Petitioner not guilty. As noted in *Strickland*, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690; *see also Meyer v. Branker*, 506 F.3d 358, 374 (4th Cir. 2007) ("Holding that such a reasoned determination constituted objectively unreasonable performance would be worse than folly: it would essentially require capital defense counsel to present evidence of remorse, even if, in their considered judgment, the evidence would affirmatively hurt their defendant's case. *Strickland* does not require any such outcome."). And in any event, the state court's conclusion that Petitioner suffered no prejudice is supported by the record. The trial judge did instruct the jury as follows: "You have heard testimony relative to prior convictions of the defendant[.] I charge you that such testimony **is not evidence of guilt** of any of the matters contained in this indictment[.]" (R. at 1147 (emphasis added).) *See Young v. Catoe*, 205 F.3d 750, 764 (4th Cir. 2000) ("Juries are presumed to follow the court's instructions . . . ." (citation omitted)). Given this jury instruction, and the evidence of Petitioner's guilt before the jury, the PCR court's conclusion that Petitioner suffered no prejudice is not unreasonable. *See Harrington*, 562 U.S. at 101 ("The pivotal question is whether the state court's application of the

*Strickland* standard was unreasonable."). Accordingly, the undersigned recommends granting

summary judgment to Respondent on Ground Six.

## F.    Ground Seven

Petitioner contends in Ground Seven that appellate counsel was ineffective in failing "to raise

on direct appeal the ground that the Petitioner's Fifth Amendment rights had been violated." (Dkt.

No. 1-1 at 48 of 51.) As noted by the Fourth Circuit in *Lawrence v. Branker*, 517 F.3d 700 (4th Cir.

2008),

> Effective assistance of appellate counsel does not require the presentation of all issues
> on appeal that may have merit, *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir.2000) (en
> banc), and we "must accord [ ] counsel the presumption that he decided which issues
> were most likely to afford relief on appeal," *id.* (internal quotation marks omitted).
> "Generally, only when ignored issues are clearly stronger than those presented, will
> the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800
> F.2d 644, 646 (7th Cir.1986), *cited with approval in Smith v. Robbins*, 528 U.S. 259,
> 288, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000).

*Lawrence*, 517 F.3d at 709. Appellate counsel is only ineffective "if his failure to challenge" an

alleged error on appeal "fell below an objective standard of reasonableness and, but for that failure,

[the petitioner] would have prevailed in his appeal." *Id.*

> The PCR court addressed the claim of ineffective assistance of appellate counsel as follows:

> Compton further alleges that his Sixth Amendment right to effective appellate
> counsel was violated by appellate counsel's failure to raise the issue that Compton's
> Fifth Amendment right to counsel had been violated[.] While a defendant is
> constitutionally entitled to effective assistance of appellate counsel, appellate counsel
> is not required to raise every non-frivolous issue presented by the record[.] Evitts v.
> Lucey, 469 US 387, 105 Sct 830, 83 Led 821 (1985); Thrift v. State, 302 SC 535,
> 539, 397 SE2d 523 (1990)[.] Where the strategic decision to exclude certain issues
> on appeal is based on reasonable professional judgment, the failure to appeal all trial
> errors is not ineffective assistance of counsel[.] Griffin v. Aiken, 775 F2d 1226 (4th
> Cir. 1985).

>    In Compton's case, Appellate counsel raised several issues including
> immunity, the promise of leniency, Rule 410, SCRE, Sixth Amendment right to
> counsel, [and] cross-examination of a witness[.] Appellate counsel testified the
> central theory of Compton's appeal was whether the agreement included immunity[.]

>    Compton now claims his appellate counsel was ineffective for failing to raise
> the issue that the State infringed on his Fifth Amendment rights by deploying Black
> as a government agent to initiate contact with Compton after he had invoked his
> Miranda rights at the July 12 meeting[.] For support, Compton relies on United States

v. Henry, 477 US 264 (1980), which forbade the state from interfering with an accused's right to counsel by use of a government agent posing as a cellmate[.] Henry, however, was premised on the Sixth Amendment[.] Because Compton was not charged with the murder at the time Black was eliciting information from him about that crime, the Sixth Amendment cannot aid Compton[.]

Nor can the Fifth Amendment provide comfort[.] It was long ago settled that the government can plant an undercover policeman in a suspect's cell for the express purpose of gathering incriminating information without running afoul of the suspect's Fifth Amendment rights[.] Illinois v. Perkins, 496 US 292 (1990)[.] Like Compton, Perkins was incarcerated on unrelated charges at the time he voluntarily spoke to the undercover agent and confessed to a murder[.] Observing that, "Miranda forbids coercion, not mere strategic deception by taking advantage of a suspect's misplaced trust in one he supposes to be a fellow prisoner," the Court further reasoned

Miranda was not meant to protect suspects from boasting about their criminal actions in front of persons whom they believe to be their cellmates[.] [Perkins] had no reason to feel that [the] undercover agent had any legal authority to force him to answer questions or that [the undercover agent] could affect [Perkins'] future treatment[.] [Perkins] viewed the cellmate/agent as an equal and showed no hint of being intimidated by the atmosphere of the jail[.] In recounting the details of the murder, [Perkins] was motivated solely by the desire to impress his fellow inmates[.] He spoke at his own peril[.]

Perkins, 496 US at 298, see also United States v. Stubbs, 944 F2d 828 (11th Cir 1991) ("Miranda and Fifth Amendment concerns are not implicated when a defendant misplaces his trust in a cellmate who then relays the information–whether voluntarily or by prearrangement–to law enforcement officials"), Alexander v. Connecticut, 917 F2d 747 (2d Cir 1990)[.]

Perkins relied on Hoffa v. United States, 385 US 293 (1966), which held the Fifth Amendment posed no impediment to law enforcement placing an undercover informant near a suspect who was free on bond awaiting trial[.] The controlling authority of Perkins and Hoffa soundly refutes Compton's claim that law enforcement's placement of Black violated Compton's Fifth Amendment rights[.]

Finally, even assuming this Court finds that appellate counsel was ineffective for not raising the Fifth Amendment issue on appeal with regard to Black, Compton suffered no prejudice from this alleged deficient performance[.] Two other inmates testified against Compton at trial[.] Both inmates testified that Compton confessed to them his involvement in the victim's murder[.] There is no evidence anywhere in the record, nor does Compton allege, that either of these two inmates was government agents eliciting incriminating information from Compton in violation of his Fifth Amendment rights[.] As a result, Compton was not prejudiced by the admission at trial of statements he made to Black, given the testimony of the other two inmates, and any error in the admission would have been deemed harmless[.]

(R. at 2051-54.)

Petitioner is not entitled to habeas relief on this claim. Mr. Dudek testified at the hearing that he "was thinking . . . that this entire thing was going to rise or fall on whether the Court said this was

41

a plea agreement or an immunity agreement." (R. at 1950.) He stated that he put "all of [his] eggs in one basket," and "that was this immunity agreement and a plea agreement [b]ecause to hold otherwise would lead to an absurd result that the man exposed himself, potentially, to the death penalty to get a 15-year burglary reduced to seven and a half years." (R. at 1950.) When he was asked whether there would have been any "harm" in additionally arguing a Fifth Amendment violation, Mr. Dudek said there was "[n]one that [he could] think of." (R. at 1951.) On his cross-examination, however, Mr. Dudek said that when he files an appeal, he does not raise every possible issue that comes up in trial. (R. at 1953.) He stated,

> As I guess, you know, Chief Justice Toal would say, really, the art of having an appellate attorney, to the extent it's an art, is wiggling down to those issues you think, you know, the Court will rule your way on[.]

(R. at 1954.)

As noted by *Lawrence*, to be constitutionally effective, appellate counsel is not required to present all issues on appeal that may have merit. *Lawrence*, 517 F.3d at 709. Here, Mr. Dudek testified that his strategy on appeal was to present the issues he believed the appellate court was most likely to "rule [his] way on." (R. at 1954.) Mr. Dudek clearly did just that–he testified he believed the best issue on appeal was the immunity argument, and the undersigned agrees with that analysis. *See Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993) ("In deciding which issues to raise on appeal, Stallings is entitled to a presumption that he decided which issues were most likely to afford relief on appeal. A decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy."); *see also Smith v. South Carolina*, 882 F.2d 895, 899 (4th Cir. 1989) ("'Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appellate advocacy." (quoting *Smith v. Murray*, 477 U.S. 527, 539 (1986))).

Furthermore, the PCR court found that Petitioner failed to establish prejudice as a result of Mr. Dudek's failure to raise the Fifth Amendment argument on appeal. As the PCR court noted, two other inmates testified similarly to that of Tracy Black. Keith Hartley testified that Petitioner came

up to him, Tracey Black, and Glenn Rouse in the cafeteria and "started telling [Black] about an incident that happened, about shooting somebody." (R. at 536.) Hartley also testified that he, Petitioner, and Black were "sitting around talking about old times," when Petitioner "was talking about burglaries, and something had come out on the way he had robbed a house, a trailer I think he said it was a mobile home." (R. at 538.) According to Hartley, Petitioner stated that he and Robert Compton went into the mobile home while Shane Rice stayed in the truck; they went in to steal jewelry, money, and guns. (R. at 538-540.) Hartley testified that Petitioner told him that he was in the house when someone came in, and they hit him with a bat and then shot him. (R. at 540-42.) Glenn Rouse testified similarly, stating that he was in the cafeteria when Black asked Petitioner if he "really d[id]" it, and Petitioner said, "Man that was a big mother fucker[.] I did what I had to do[.]" (R. at 555-56.) According to Rouse, Petitioner then "motioned like this, like he had a gun in his hand, and he went bam, bam, bam." (R. at 556.) In light of the foregoing, the PCR court's conclusion that Petitioner did not suffer prejudice is not an unreasonable determination. Accordingly, the undersigned recommends granting summary judgment to Respondent as to Ground Seven.

## CONCLUSION

It is RECOMMENDED, for the foregoing reasons, that Respondent's Motion for Summary Judgment (Dkt. No. 11) be GRANTED; and the Petitioner's habeas petition be DISMISSED WITH PREJUDICE. It is further RECOMMENDED that a certificate of appealability be denied.[3]

IT IS SO RECOMMENDED.

_____
MARY GORDON BAKER
UNITED STATES MAGISTRATE JUDGE

August 1, 2016
Charleston, South Carolina

**The parties' attention is directed to the important notice on the next page.**

---

[3]Title 28, Section 2253 provides in relevant part,
(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
(B) the final order in a proceeding under section 2255.
28 U.S.C. § 2253. A prisoner satisfies this standard by demonstrating that reasonable jurists would find this court's assessment of his constitutional claims debatable or wrong and that any dispositive procedural ruling by the district court is likewise debatable. *See Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683 (4th Cir. 2001). In the case *sub judice*, the legal standard for a certificate of appealability has not been met. The undersigned therefore recommends that a certificate of appealability be denied.

44

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. **Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.** "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

**Robin L. Blume, Clerk**
**United States District Court**
**Post Office Box 835**
**Charleston, South Carolina 29402**

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).